## COMMONWEALTH *vs.* LUIGI EPIFANIA.

No. 10-P-1931.

Suffolk. April 14, 2011. - August 9, 2011.

Present: KANTROWITZ, BROWN, & RUBIN, JJ.

*Animal. Burning a Dwelling House. Constitutional Law,* Assistance of counsel. *Practice, Criminal,* Motion to suppress, Assistance of counsel.

At the trial of indictments charging the defendant with, inter alia, wilfully and maliciously killing the animal of another person, the evidence was sufficient to permit the jury to find beyond a reasonable doubt that the cat at issue was owned by another person. [72-74]

A Superior Court judge properly denied the criminal defendant's pretrial motion to suppress a statement he made to police, where the defendant, who had properly waived his Miranda rights, did not subsequently unambiguously invoke his right to counsel. [74-75]

INDICTMENTS found and returned in the Superior Court Department on September 26, 2007.

A pretrial motion to suppress evidence was heard by *Frank M. Gaziano,* J., and the cases were tried before *Charles T. Spurlock,* J.

*Kenneth I. Seiger* for the defendant.

*Anthony J. Dutra,* Assistant District Attorney, for the Commonwealth.

RUBIN, J. This case presents a question of first impression about the scope of protection provided to animals under G. L. c. 266, § 112, as amended by St. 2004, c. 319, § 3, which provides criminal punishment for "[w]hoever wilfully and maliciously kills, maims or disfigures any horse, cattle or other animal of another person," as well as a question about the invocation of the defendant's Miranda rights.

*Background.* The following evidence against the defendant was presented at trial. Alcadio Rivera, a longtime friend of the

defendant, rented from Lawrence Sullivan a room on the first floor at 204 Princeton Street in the East Boston section of Boston. Sullivan's sister owned a cat named Mr. Nunu that she left at the 204 Princeton Street property after she moved into an apartment where pets were not permitted. After the cat's arrival at the property, Rivera fed the cat "all the time," and the cat would stay in his apartment the majority of the time when not out in the neighborhood. While Rivera claimed that Mr. Nunu was a neighborhood cat that belonged to everybody, Sullivan testified that the cat was Rivera's and that Rivera had in fact told him so.

On June 13, 2007, at 5:30 A.M., the defendant arrived at 204 Princeton Street and asked Rivera whether he could stay with him. Rivera, concerned that the defendant appeared to be on drugs and that he (Rivera) had $500 dollars of the defendant's money that the defendant had told him not to give back, refused. Rivera left for breakfast a couple of hours later and did not see the defendant at that time.

Less than an hour later, a man roughly fitting the defendant's description was seen near 204 Princeton Street holding a cat. The same man was seen fleeing the area ten minutes later. Immediately afterward, a dead cat was found severely burned and wrapped in some sort of fabric directly below the window of Rivera's apartment. The window to the apartment was broken, and the area around the window was charred. Sullivan identified the cat as the one that lived at 204 Princeton Street. He testified that although "[h]alf of the animal was pretty burned bad," he recognized Mr. Nunu because he was "pretty much the only black cat I've seen around [the neighborhood]."

During interrogation by the police, the defendant admitted kicking the cat so hard that the cat died, and then placing the cat in a black bag, lighting the bag on fire, and throwing it through Rivera's window. The defendant was convicted by a Superior Court jury of arson of a dwelling house, G. L. c. 266, § 1, and wilfully and maliciously killing the animal of another person, G. L. c. 266, § 112.

*Discussion.* The defendant claims that his conviction under § 112 must be reversed because there was insufficient evidence that the deceased animal belonged to "another person." In

determining whether the evidence is sufficient to support a conviction, "the question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979), quoting from *Jackson* v. *Virginia*, 443 U.S. 307, 318-319 (1979).

At common law, cats did not receive through ownership by human beings the same legal protection provided to some other animals.[1] Thus, as the Supreme Judicial Court explained over 140 years ago in *Blair* v. *Forehand*, 100 Mass. 136, 140 (1868), at common law, an individual could not be prosecuted for larceny of a cat (or a dog) "even in a state of domestication." There was thought to be "no absolute and valuable" property interest in such animals. *Ibid.* The same was not true with respect to "[b]easts which have been thoroughly tamed, and are used for burden or husbandry, or for food, such as horses, cattle and sheep" which were viewed as "property of intrinsic value." *Ibid.*

Consistent with this, for 150 years, starting in 1836, § 112 and its predecessors provided criminal punishment for the wilful and malicious killing of "any horse, cattle, or other beast of another person." Pub. Stats. 1882, c. 203, § 93. See Rev. Stats. 1836, c. 126, § 39 ("any horses, cattle or other beasts of another person"); Gen. Stats. 1860, c. 161, § 80 ("any horses, cattle, or other beasts, of another person"). In 1986, in apparent recognition of a more modern view, the Legislature amended § 112, so that it now refers to the malicious killing not of "beast[s]," a limited category, but of "animal[s] of another person."

Viewed in the light most favorable to the Commonwealth, the jury were entitled to credit Sullivan's testimony that the cat was Rivera's and disbelieve Rivera's testimony to the contrary. There was thus sufficient evidence for the jury to find beyond a reasonable doubt that Mr. Nunu was owned by "another person," in this case Rivera.

---

[1] There is debate about whether the law should protect animals through recognition of their having inherent rights or through their ownership by human beings, and about the proper scope of that legal protection. See generally Sunstein & Nussbaum, Animal Rights: Current Debates and New Directions (2004).

There are two other possibilities as well. First, it is possible that the cat remained under the ownership of Sullivan's sister. Leaving one's cat at someone else's residence would not necessarily terminate one's ownership. Second, it is also possible that this was a "neighborhood cat," as Rivera testified, but that more than one person was claiming and exercising rights of ownership. Under the statutory rule of construction contained in G. L. c. 4, § 6, the singular must be read to include the plural, and therefore, a cat would be the animal of "another person" even if he had more than a single owner, for example, if the cat were owned by an entire family. There is no apparent reason a domesticated cat could not be owned by more than one unrelated person. We need not, however, determine whether there was sufficient evidence to convict the defendant on these theories of the cat's ownership, since it suffices to say in this case that the evidence of ownership by Rivera was sufficient to support the conviction.

The defendant also seeks reversal of both his conviction under § 112 and his conviction of arson of a dwelling house, G. L. c. 266, § 1, on the ground that the motion judge (who was not the trial judge) erred in denying his pretrial motion to suppress his statement to the police. He argues that the motion judge should have granted his motion because his Federal and State constitutional rights were violated when the police did not terminate his interrogation after he requested counsel.

A "suspect must unambiguously request counsel" in order to invoke his right to counsel under the Fifth Amendment to the United States Constitution. *Davis* v. *United States*, 512 U.S. 452, 459 (1994). This formulation has been used repeatedly in the Massachusetts case law, see, e.g., *Commonwealth* v. *Morganti*, 455 Mass. 388, 396-397 (2009), and the Supreme Judicial Court has not suggested that a different standard is applicable to the right to counsel under the Massachusetts Constitution and Declaration of Rights.

After he was arrested and prior to his interrogation, the defendant properly waived his Miranda rights. During the interrogation, the defendant initially denied involvement in the crimes at issue in this case. After the police described the investigative methods that they claimed would be used in the case, including

a "voice stress test," the defendant asked either, "do I have a choice to have a lawyer in there?" which is how the transcript reads, or, "[Do] I have a choice to have a lawyer on that?" which is how the judge recounted his statement. The officer responded, "You can have your right to counsel," and then proceeded to continue the interrogation.

Under either version of the defendant's question, it appears to refer to the discussion of the possible use of a "voice stress test" that immediately preceded it, and to ask about the defendant's right to counsel during any future administration of that test. It is not an unambiguous invocation of the right to counsel. See *Commonwealth* v. *Girouard*, 436 Mass. 657, 666 (2002). Consequently, the judge did not err in denying the motion to suppress.

*Judgments affirmed.*